IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs January 13, 2009

**STATE OF TENNESSEE v. JOSEPH A. HALE**

**Direct Appeal from the Circuit Court for Van Buren County**
**No. 2005-F      Larry B. Stanley, Judge**

———————

**No. M2008-00872-CCA-R3-CD - Filed June 15, 2009**

———————

A Van Buren County jury convicted the Defendant, Joseph A. Hale, of second degree murder, and the trial court sentenced him as a Range I offender to seventeen years in prison. The Defendant appeals, contending that: (1) the evidence is insufficient to sustain his conviction because he was justified in using deadly force and because he committed the killing in a state of passion produced by adequate provocation; and (2) the trial court erred when it instructed the jury, precluding it from considering voluntary manslaughter. After a thorough review of the record and applicable authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Dan T. Bryant (at trial) and L. Scott Grissom (at trial and on appeal), McMinnville, Tennessee, for the Appellant, Joseph A. Hale.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Lacy Wilber, Assistant Attorney General; Lisa Zavagiannis, District Attorney General; Tom P. Thompson, Jr., and Thomas H. Swink, District Attorneys General Pro Tem, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**

A Van Buren County grand jury indicted the Defendant for one count of the first degree murder of John Scott. The State later filed a motion to amend the indictment to charge second

degree murder. At the Defendant's trial, the following evidence was presented:[1] Robert Hastings testified that he owned the NAPA Auto Parts store and that he knew the victim, John Scott, from the store, where Hastings allowed Scott to purchase parts on credit. On May 18, 2004, Scott sent one of his employees to NAPA, where Hastings mentioned that Scott owed Hastings money. Later, Scott called the store asking that Hastings come and see him at Scott's place of business. Hastings thought that this meeting was to arrange Scott's payment of the money he owed to the store. When Hastings arrived, Scott motioned for Hastings to follow him into his office. There, Scott hit him with his fist. Hastings said that he did not hit Scott back but tried to stop Scott from hurting him. Hastings testified that Scott hit him two or three times, and, after Hastings was finally able to get loose from him and get into the car to leave, Scott told him that he would kill him. Hastings, who suffered minor cuts and bruises from the incident, left and went immediately to the courthouse and swore out a warrant against Scott. Hastings went back to his auto parts store and told his two sons what had happened. He also told his sons that he had sworn out a warrant against Scott and to stay away from Scott. His sons were upset, in part because Robert Hastings was sixty-three at the time of this incident and Scott was forty-two. On cross-examination, Robert Hastings agreed that he did not know how long his sons were upset by what had transpired.

Matt Hastings testified he worked at the NAPA Auto Parts store owned by his father, Robert Hastings, and he and his father were friends with the Defendant. He also knew Scott, who had done a lot of business at the store. In May 2004, Hastings learned about Scott hitting his father, which upset him, but his father told him not to retaliate. Later, during the afternoon after he learned of this incident, Matt Hastings went to the Shell gas station, where he told the Defendant what had happened between Scott and Robert Hastings. The Defendant seemed upset by Scott's behavior and did not like the idea of a younger man hitting an older man. The Defendant and Matt Hastings went to the Defendant's house, and the Defendant went inside for ten minutes while Hastings waited in the car. The Defendant returned to the truck carrying a revolver, which did not alarm Hastings because the Defendant often carried a gun. The two men then went to the house of Jason Smith, who was the Defendant's friend and a NAPA employee. While at Smith's house, the Defendant mentioned going to Scott's house, but Hastings told him not to worry about it because his father had taken care of the problem using legal channels. The three men left and went to the house of another friend, Jimmy Bouldin, but he was not home. They stopped and talked with some of Hastings' friends at Bouldin's house, and Hastings stayed with his friends while the Defendant and Smith left. Hastings next saw the Defendant and Smith later that evening when they returned to Bouldin's house reporting that the Defendant had been shot and asking him to call 911 to come to the Piney Fire Hall.

Jason Smith testified that he worked at the NAPA store and that he knew Scott was a customer there. Smith testified that he and the Defendant had been friends because they were both mechanics and would help each other in that regard. On the day of this shooting, Smith was working on a lawnmower at his house when the Defendant and Matt Hastings arrived at the

---

[1]For clarity, we summarize this testimony in the chronological order rather than in the order it was presented at trial.

house. The two asked Smith to take the Defendant to Jimmy Boles's house, which was not an unusual request because Smith would often drive for anyone who had been drinking. The three men left Smith's house in the Defendant's pick-up truck and went to the Parkway South Side Market ("Market") where the Defendant bought some beer. They then took Hastings to Jerry Bouldin's house where he planned to help Bouldin erect a fence. After dropping off Hastings, the Defendant and Smith went to Jimmy Bouldin's house, which was two houses away. Jimmy Bouldin was not home, so they rode around waiting for him. When they went back to his house, he still had not arrived, so Smith was going to take the Defendant home. The Defendant asked to stop to buy more beer first, and the two men returned to the Market.

Smith testified that, when the two men returned to the Market, he did not know that Scott was at the Market. He said he was unaware that the Defendant was angry with Scott, but he had heard the Defendant say that he was upset about a "young man whooping an old man." Smith waited in the truck, with his head lying on the steering wheel, while the Defendant went into the Market. The Defendant returned with beer in a box, collected some trash, and walked toward a trash receptacle. Smith then saw the Defendant with a beer bottle and saw a beer bottle hit the driver's side window of a black Blazer and heard glass break. Smith saw the Defendant reach inside the Blazer to the point where the Defendant's upper shoulder was in the Blazer while his head and the rest of his body was outside the Blazer. Smith then heard a gunshot, and the Defendant fell to the ground. Smith opened the driver's side door of the Defendant's truck and tried to go to the Defendant, but Scott, who was in the Blazer, pointed the gun in Smith's vicinity.

Smith testified that he got back in the pick-up truck and tried to start the engine. The Defendant had gotten up and was coming back towards the vehicle holding his stomach. Smith said that he never saw the Defendant with a gun, and he did not hear the Defendant shoot. He said that, as he was driving the truck away from the scene, the Defendant had his back toward him with his arms out the truck's window. He reiterated that he never heard any more shots, saying his ears were ringing from the first shots fired by Scott. The first time Smith saw the Defendant with a gun was when they stopped the truck at the Piney Hall Fire Department, where the Defendant, saying he had "messed up" and had "made a mistake," stuck the barrel of his gun into his mouth. Smith said he grabbed the gun and pulled it back. Smith went to where Matt Hastings was and asked him to call 911 because the Defendant had been shot. He went back to the fire department and waited for the ambulance and police.

On cross-examination, Smith testified that the Defendant cannot grasp objects with his right hand because his right hand was injured in a sawmill accident. Smith said he never saw the Defendant throw a beer bottle at the passenger window of Scott's truck. He said, rather, he saw the Defendant swinging his right arm inside Scott's vehicle. Smith was unsure whether the Defendant backed away from Scott's Blazer before he was shot or if the shot itself pushed the Defendant backward. Smith said he had known the Defendant for thirteen or fourteen years, and the Defendant was a peaceful man with no reputation for violence. This incident, he said, was out of character for the Defendant. On redirect examination, Smith acknowledged the Defendant said on the day of the shooting that he wanted to "whip" Scott. On recross-examination, Smith

clarified that the Defendant had not used Scott's name when he mentioned wanting to "whip" someone.

Randall Mealer testified he had done some mechanic work for Scott in the past and had helped him at his house. Mealer saw Scott on May 18, 2004, when Scott stopped him while the two were driving. Scott told Mealer about an incident that upset Scott earlier in the day, and the two talked for roughly thirty minutes. At the end of this conversation, Scott said that he was going to get some gas and then go see his girlfriend. Mealer followed Scott, who was traveling south, toward the Market. Around Sullivan Sawmill, he noticed a gray Chevrolet pick-up truck that had been traveling north make a U-turn and start following Scott. Mealer then saw Scott's Blazer and the pick-up truck both pull into the Market. Mealer testified that he was later informed what had happened at the Market, and he returned to the gas station about forty-five minutes after he had last seen Scott and the pick-up truck. There, he saw emergency personnel working on Scott, and the pick-up truck was gone.

Richard Dale Cope testified that, at the time of this shooting, he did not know the Defendant and had only met Scott one time. Cope said he was at the Market on May 18, 2004, at around 6:30 p.m. getting gas. Just as he was about to get gas, Scott pulled into the Market to get gas from the other side of the same pump. While the two pumped gas into their vehicles, they had a conversation during which Scott expressed concern about the passenger of a truck that had pulled into the Market after them. The truck, which carried two passengers, pulled in and made a U-turn. Scott asked Cope to go into the store with him, and Cope agreed. As Cope and Scott went into the Market, the passenger from the truck was leaving the Market. Inside Cope and Scott paid for their gas and then returned to their vehicles.

Cope testified that, when he got to the rear of his truck he saw the Defendant exit the gray truck and run toward Scott. Scott ran and jumped into his Blazer and slammed the door shut. The Defendant, who had a beer bottle in his right hand, grabbed Scott and went to hit him. Cope heard a gun fire, heard the Defendant say "he shot me in the gut," and saw the Defendant fall onto the ground, where he lay for ten or fifteen seconds. Scott, who remained in his Blazer, looked at Cope and said, "I had to, Rick. I had to." Cope said the Defendant got up off the road quickly and staggered towards his truck. The Defendant picked up a gun from his truck, and, when Scott saw the Defendant with the gun, he started shooting and shot at the Defendant approximately five times. Cope testified that Smith, the driver of the vehicle, turned around and started shooting while the Defendant sat in the front seat of the truck. The Defendant's truck then began to leave. Cope went to Scott who said, "[T]hey got me. They got me good, Rick." Scott then shot three times straight through his blazer's windshield toward the pick-up truck as it pulled out of the Market.

Cope said he ran inside the Market and asked someone to call 911 because Scott had been shot. Cope returned to Scott and, along with others present, tried to stop the bleeding until emergency personnel arrived. Cope agreed that, after Scott shot the Defendant the first time, there was a pause in the shooting until Scott saw that the Defendant had a gun.

-4-

Winton Humble, the owner of the Market, testified that the day of the shooting he worked four hours in the morning and five hours in the evening and that he knew Scott as a customer. Humble did not know the Defendant personally, but he was familiar with the Defendant's family. Humble recalled the day of the shooting, saying that he was assisting a man rewiring and relocating the ATM machine at the Market when he heard a "crash" or a "pop." Humble said he did not pay very much attention to the noise, but "[a] little while later" he heard another of the same noise. Humble did not recognize the sound as gunfire, but he looked outside and saw a large, shirtless man backing away from Scott's vehicle. Humble lost sight of the large man when a post blocked his view. Less than two minutes later, Humble heard three shots from the left of Scott's vehicle, and he described the shots as louder than the sound he heard before. Humble looked out the window again and saw that Scott, who was in his Blazer, had a pistol in his hand. Humble instructed those inside the Market to get down onto the floor, and he went behind the counter. When he was sure the shooting had stopped, Humble went to Scott's vehicle. Scott was unable to talk and had obviously been shot. Humble took the gun from Scott's hand and laid it on the dashboard of the car.

Humble testified that he then attempted to render first aid to Scott, who never responded to his questions. A paramedic was on the scene within two or three minutes of the shooting. It took longer for the ambulance to arrive because the ambulance first attended to the Defendant, who had also been shot and was a short distance away. On cross-examination, Humble clarified that, after he heard the second, louder set of shots, he saw Scott firing his pistol from his vehicle. On redirect examination, Humble testified it appeared that Scott was firing out his front window.

Keith Humble, Winton Humble's son, testified he was present at his father's store at the time of this incident. He was napping in the dining area of the Market and woke up when he heard a "pop." He looked out the front door and saw a blue Chevrolet pick-up truck come to a stop. The passenger door opened and then shooting started. Humble testified that the truck's passenger was the one shooting. Humble recalled that Barney Evans, a deputy sheriff arrived and that he told the sheriff that the truck involved left traveling south.

Tosha Bouldin, Winton Humble's daughter, stated she knew Scott as a customer at the Market, but she did not know the Defendant. On May 18, 2004, Bouldin was working the cash register at the Market when the Defendant, who was driving a GMC or Chevrolet truck, came into the store and purchased a six-pack of beer. Fifteen to thirty minutes later, Scott entered the store. Bouldin recalled that Scott was usually friendly and in a good mood, but, on this occasion, he acted "strange[ly]" and only said "hello." After Scott purchased cigarettes and gas, he talked to Ricky Cope. While Scott and Cope talked, the Defendant returned to the store to purchase a drink and left. Scott and Cope subsequently left together.

Bouldin testified that, after the men left, she sat at a table in the Market with two other women. While seated, she heard three or four "pops." She stood up to look out of the window, but her father told her to "hit the floor," so she got behind the counter and called 911. Bouldin did not recall hearing any more gunshots after the first three or four. Bouldin recalled that, shortly after the shooting, multiple people were at Scott's car trying to render first aid. She saw the Defendant quickly leave and turn left out of the Market. On cross-examination, Bouldin

testified that she waited on both Scott and the Defendant and that neither one of them appeared to be drunk. Further, she could not tell whether either had been drinking at all.

Joey Grissom, a first responder of the local fire department, testified that he responded to the shooting in this case. Grissom said that his mother-in-law, who was at the Market at the time of the shooting, called him asking that he come immediately. When he arrived, three to five minutes later, he attended to Scott, who was not breathing. Grissom retrieved his bag, tape, and oxygen tank to assist Scott's breathing. Grissom described Scott as cold and clammy and said Scott appeared to have lost a significant amount of blood. Grissom said that Scott's veins were "flat," and he could not start an IV. When the ambulance arrived, medics started an IV in Scott's sternum, and they administered fluids until the helicopter arrived.

Jason Rowland, an officer with the Warren County Sheriff's office and formerly an investigator with the District Attorney's Office, testified [2] that, during the day of May 18, 2004, the Van Buren County Sheriff's Department called him and informed him that Robert Hastings had filed a complaint against the victim in this case, John Scott. According to Officer Rowland, the Sheriff's Department did not want to investigate the complaint because Scott was a county commissioner. Officer Rowland went to Van Buren County with Tennessee Bureau of Investigations ("TBI") Special Agent Wicks, where they interviewed Hastings. Following that meeting, Officer Rowland and Agent Wicks spoke with Scott and asked him to come to the Sheriff's Department, where they obtained a statement from him and signed a warrant against him for assault. He was arrested and made bond.

Later that evening, District Attorney Potter notified Officer Rowland of the shooting, and Officer Rowland picked up District Attorney Potter before heading to the crime scene, where they arrived after dark, around 8:00 p.m. Officers from the Van Buren County Sheriff's Office had already roped off the area of the Market where the shooting occurred. Also, by this time, both the Defendant and the victim had been air-lifted to Erlanger Hospital with bullet wounds. Officers at the scene gave Officer Rowland a Smith & Wesson 9 millimeter semi-automatic gun, which they had found at the scene and which contained no shells or cartridges. He sent this gun to the TBI for testing. In the area of the gun, Officer Rowland found four spent 9 millimeter shells, some of which were on the ground and some of which were in Scott's Blazer.

Officer Rowland identified multiple pictures of the crime scene, one of which showed Scott's Blazer parked near the Market. One picture depicted the neck of a broken beer bottle found near the Blazer. The pictures showed three bullet holes in the driver's side door and a blood pool under the Blazer's step-up. The Blazer's windshield also had three bullet holes, which the officer later determined were created when bullets traveled from inside the vehicle through the windshield. The back window of the driver's side also contained a bullet hole. The officer showed pictures of where Scott sat during the shooting, in the Blazer's driver's seat, and the seat appeared bloody. Officer Rowland testified that a black nylon holster was attached to

---

[2] For the sake of clarity, Officer Rowland's testimony, from both his direct and cross-examinations, is presented in chronological order.

the inside of the driver's side door of the Blazer. When Officer Rowland examined Scott's Blazer further the following day, he discovered that only two of the three bullet holes went completely through the door of the truck. There were a total of four shots to the Blazer, the fourth of which went through the window.

The Defendant's Chevrolet truck was located some distance from the Market, near Piney Fire Hall. Officers roped off this area also with crime scene tape, and gave Officer Rowland a loaded .44 magnum Smith & Wesson revolver found by the Defendant's truck. Officer Rowland retrieved the two live rounds and the remaining casings from the revolver, all of which he sent to the TBI for testing. The bullets from the revolver were twice the size of the bullets from the 9 millimeter. Officer Rowland later learned that the revolver belonged to the Defendant and that the Defendant had a valid permit to carry a handgun. The officer identified a log sheet of the inventory of the truck, which showed officers found on the front seat of the truck a box containing twenty-three .44 magnum shells. Officer Rowland testified that he examined the truck for bullet holes on multiple occasions but did not find any. Photographing the truck, the officer noticed a twelve-pack of Budweiser on the floorboard, with one extra Budweiser bottle lying on the floorboard.

Officer Rowland testified that he interviewed several witnesses with regard to this case, including Jason Smith; Robert Hastings's son, Matt Hastings; Winton Humble; and Keith Humble. The officer spoke with the Defendant at Erlanger Hospital, and he recorded the following account of his interview with the Defendant:

> [The Defendant.] Interview of May 19, 2004. On May 19, 2004, I went to Erhlanger Hospital and talked to [the Defendant] about the shooting he was involved in. After the reading of his rights by Special Agent Wicks, [the Defendant] said that he had met John on 111 and him and Jason turned around on John and went back to the Parkway Store. [The Defendant] said he was going to throw away the bottle and he was going to hit John if he could. He said that John shot him and that he went and got his gun and shot him back. He said that he thought he shot him (2) times.

Officer Rowland noted Scott's truck contained four bullet holes, and there were two live rounds in the Defendant's revolver, which held a total of six rounds. The officer testified that doctors retrieved multiple bullets from Scott's body, and he identified a picture of the bullets that were recovered. Officer Rowland testified he had known the Defendant for a long time and had never known him to be in trouble before this incident. Officer Rowland agreed that the Defendant's right hand was "mangled," and the Defendant showed his hand to the jury.

Dr. Thomas Deering, who performed Scott's autopsy, testified that Scott suffered three gunshot wounds to his leg, which broke both of his femur bones. Dr. Deering said that Scott underwent surgery for his injuries, where pins were placed in his body to try to help repair these fractures. Scott suffered multiple strokes and a brain herniation as well as a small fracture to his voice box. Dr. Deering recovered two projectiles from Scott's body. Dr. Deering opined that Scott died as a result of complications from multiple gunshot wounds to his legs. On cross-

examination, Dr. Deering agreed that the injuries to Scott's voice box could have occurred while emergency personnel attempted to administer oxygen. He also stated that he could not say whether the three gunshot wounds were created by three separate bullets or by only two bullets, one of which broke into fragments creating multiple wounds.

Randall Nelson, with the TBI crime laboratory, testified that he examined the broken window of Scott's Blazer. He determined that the broken window had two impact points, one near the center of the window and the other near the bottom edge of the window. He was able to determine neither what type of force caused the impacts, nor the direction of the force at impact. He said it seemed consistent, though, with something traveling at a high rate of speed, such as something fired from a gun. Agent Nelson testified that the glass was tempered, making it very strong. As such, it was unlikely that a beer bottle would break the window.

Shelley Betts, a TBI firearms technician, testified about the report of the findings in this case. She said that the report indicated that the lower bullet hole in the driver's side of Scott's Blazer was created by a bullet traveling from inside to outside the car. The report said that the path of the bullet that created the upper hole could not be determined. The report indicated that a bullet retrieved from a metal bar of the Blazer was fired from the Defendant's .44 magnum revolver. The report said agents were able to match copper jackets found at the scene to Scott's 9 millimeter gun, and a projectile taken from the Defendant's body matched Scott's gun.

## II. Analysis

On appeal, the Defendant contends: (1) the evidence is insufficient to sustain his conviction because he was justified in using deadly force and because he committed the killing in a state of passion produced by adequate provocation; and (2) the trial court erred when it instructed the jury, precluding it from considering voluntary manslaughter.

### A. Sufficiency of the Evidence

On appeal, the Defendant contends that the evidence is insufficient to sustain his conviction for second degree murder because the evidence clearly proved that the victim fired at the Defendant before the Defendant retrieved his weapon and returned fire. The Defendant concedes that the trial court properly instructed the jury on self-defense but contends that the evidence does not support the jury's rejection of this defense. The State counters that the Defendant instigated this confrontation, and, after being shot, he got up, walked to his car, retrieved his gun, and opened fire on Scott's truck. This, the State says, was not done in self-defense because Scott had stopped shooting at the Defendant, and the Defendant chose to continue the fight and escalate the situation to murder.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn.

2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.w.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The Defendant was convicted of second degree murder, which is the knowing killing of another. T.C.A. § 39-13-210(a) (2006). A person acts knowingly with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause that result. T.C.A. § 39-13-106(2) (2006).

Viewing the evidence in the light most favorable to the State, we conclude that it is sufficient to support the Defendant's conviction for second degree murder. Considering the

-9-

evidence in the light most favorable to the State, the evidence proves that the Defendant heard about the conflict between Scott and Hastings and then went to his house to retrieve his gun. He contemplated going to Scott's house, but decided instead to go to the Market to purchase beer. At the Market, the Defendant saw Scott getting gas and initiated a confrontation with Scott by throwing a beer bottle at Scott's car and then trying to hit Scott. Scott then shot the Defendant in the stomach. The Defendant fell to the ground where he lay for ten to fifteen seconds. The Defendant got up, and Scott made no attempt to shoot the Defendant at that point. The Defendant went back to his truck and got his gun. The Defendant and Scott shot at each other several times. The Defendant hit Scott twice in the legs. After leaving the Market, the Defendant acknowledged to Smith that he made a "big mistake." This evidence is sufficient to sustain the Defendant's conviction because it proved that the Defendant was aware that his conduct was reasonably certain to cause Scott's death.

The Defendant further contends that the jury improperly rejected his contention that he acted in self-defense. Tennessee's self-defense statute, Tennessee Code Annotated section 39-11-611(a) (2003), provides as follows:

> (a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

When a defendant relies upon a theory of self-defense, the State bears the burden of proving that the defendant did not act in self-defense. *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001). Further, it is well-settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact. *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). It is within a jury's prerogative to reject a claim of self-defense. *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997).

In this case, the jury clearly rejected the Defendant's claim of self defense. The jury could have based this rejection on the fact the force was not immediately necessary to protect the Defendant from Scott's use of force. By all accounts, Scott had ceased firing at the Defendant after the Defendant fell to the ground. The Defendant lay on the ground for several seconds, got up, and walked to his truck. Scott did not fire at the Defendant while the Defendant retreated to his truck. We will not disturb the jury's factual finding that the Defendant did not have a reasonable belief that his force was immediately necessary to protect himself from Scott's use of force. The Defendant is not entitled to relief on this issue.

**B. Jury Instruction**

The Defendant next contends that the trial court erred when it instructed the jury on its consideration of second degree murder instead of voluntary manslaughter because the jury instructions told the jury to stop deliberating after finding that the elements of second degree murder existed. The State counters that the trial court instructed the jury with proper sequential jury instructions, which have repeatedly been upheld by the Tennessee Supreme Court.

The trial court explained the distinction between second degree murder and voluntary manslaughter, stating:

[T]he distinction between voluntary manslaughter and second degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

The trial court then instructed the jury on the order in which the jury was to consider the possible offenses:

There is only one (1) Count. That is second degree murder. Then, there are the lesser included offenses that I just went through. You will begin at the top where the charge is second degree murder. If you have a reasonable doubt as to the defendant's guilt of second degree murder as charged in the indictment, then your verdict would be not guilty as to that offense. Then, you would then proceed to determine whether the defendant is guilty or not guilty of the lesser included offense of voluntary manslaughter. . . . If however, you found the defendant guilty of second degree murder, you will stop. If you found [the Defendant] not guilty of second degree murder, but guilty of voluntary manslaughter, you would stop. What I am saying is that you start at the top, and if you find not guilty as to one and you had reasonable doubt as to one, you go to the next one. You keep going on down. If you find him guilty on the top or the next or the next, then you would stop at that point, if you find the defendant guilty of one of those offenses.

Our Supreme Court recently held that sequential jury instructions satisfy a defendant's Tennessee Constitutional right to a trial by jury, which includes the right to have jury instructions on charged and lesser included offenses. *See* Tenn. Const., art. I, section 6; *State v. Davis*, 266 S.W.3d 896, 905 (Tenn. 2008); *see also State v. Damien Clark*, No. W2007-00651-CCA-R3-CD, 2009 WL 890886, at *13 (Tenn. Crim. App., at Jackson, June 3, 2008), *no Tenn. R. App. P. 11 application filed*. The record reveals that the jury received sequential jury instructions. Also, the trial court's instruction regarding second degree murder noted the distinction between voluntary manslaughter and second degree murder relative to voluntary manslaughter requiring a killing resulting "from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." We conclude that the instructions as given, requiring sequential assessment of the offenses, did not preclude the jury from considering voluntary manslaughter and did not violate the Defendant's rights to due process and to trial by jury. They were sufficient for the jury to properly consider second

degree murder in relation to the requirements for voluntary manslaughter. The Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE